# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENISE ATILANO, | ) 1:08cv01091 DLB |
| | ) |
| | ) ORDER REGARDING PLAINTIFF'S |
| Plaintiff, | ) SOCIAL SECURITY COMPLAINT |
| v. | ) |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) |
| Defendant. | ) |

## BACKGROUND

Plaintiff Denise Atilano ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Dennis L. Beck, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. On August 27, 2008, the action was reassigned to the Honorable Dennis L. Beck for all purposes.

1

## **FACTS AND PRIOR PROCEEDINGS**[2]

Plaintiff protectively applied for DIB and SSI in April 2005, alleging disability since December 12, 2002, due to depression, arthritis, and severe migraine headaches. AR 22, 60, 79, 182. After being denied initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). AR 25-29, 31-36, 39, 184, 185. On January 10, 2008, ALJ Peter Valentino held a hearing. AR 186-220. ALJ Valentino denied benefits on January 25, 2008. AR 10-22. On June 5, 2008, the Appeals Council denied review. AR 4-6.

Hearing Testimony

ALJ Valentino held a hearing on January 10, 2008, in Bakersfield, California. Plaintiff appeared with her attorney, Rosemary Abarca. AR 188. Dr. Mary Jesko, vocational expert ("VE"), also testified. AR 212-218.

Plaintiff testified that she is a widow, but now lives with her significant other. AR 189. She was born in 1946, and is 61. AR 189. She is approximately 5'3" and weighs 190-195 pounds. AR 189. She has a valid California driver's license. AR 189. She graduated from high school and attended college off and on for two years. AR 189-90. She does not have an associate of arts degree. AR 190.

From June 1988 through December 2002, Plaintiff worked for a bar association lawyer referral service. AR 190. She had several titles, including referral clerk, mandatory fee arbitration coordinator, program coordinator, Bar Association coordinator, accounts receivable, and "MCLA coordinator." AR 190. She did not have supervisory responsibility. AR 190-91. In her referral clerk work, she took calls from clients wanting an appointment with an attorney, contacted an appropriate attorney and set up an appointment. AR 192. She spent four or four and a half hours doing her referral duties. AR 192-93.

Plaintiff's next major duty was mandatory fee arbitration coordinator. AR 193. This duty consisted of opening up cases when clients submitted a fee dispute with their attorneys. AR 193. A client would call and request a form to submit a complaint. AR 193. Once she received the

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

2

form, she would open a case and send out letters to the attorneys and the client. AR 193. The process would take from three to five months to complete. AR 193. Plaintiff followed up with correspondence and would assign an attorney to hear the case. AR 193-94.

Plaintiff also did accounts receivable and made bank deposits. AR 194. She used an office computer for accounts receivable. AR 195. In an eight hour day, she would spend almost eight hours on the computer, inputting information. AR 195. It was basically a sit-down job, but she had to lift boxes of files. AR 195.

Plaintiff testified that she stopped working in December 2002 because she started having medical problems. AR 195. She was "stressed out." AR 196. Before she quit, she was being treated by Dr. Burns for stress. AR 196. She saw him regularly when she was working. AR 196. He would give her medication for depression and for sleep. AR 196. He also gave her muscle relaxers and pain pills. AR 196. He was her primary doctor. AR 197. He did not refer her to a psychiatrist. AR 197. She was referred to a neurologist in 1997 when she had paralysis on one side of her face for about three weeks and paralysis on the other side of her face six months later. AR 197. She last saw her neurologist in 1998, because the paralysis went away. AR 198.

Plaintiff testified that she gave notice before she left the referral service. AR 197. She was missing work and they put her on part-time employment for six months. AR 197. She could not make it to work because of migraine headaches, palpitations and anxiety attacks. AR 197.

Plaintiff testified that Dr. Burns was treating her when she was experiencing bad headaches and anxiety attacks. AR 199. He continued to treat her until she moved to Bakersfield in December 2002. AR 199. She moved to be closer to her family. AR 200. Her significant other moved with her. AR 200. He was not working and has been retired. AR 200.

After she moved in December 2002, she was experiencing bad headaches, stress and pain in her shoulders. AR 200. She went to Kern Medical Center for treatment. AR 201. She did not receive treatment between 2003 and 2006 because she did not have insurance. AR 201. Her significant other was not able to help financially because he was not making any money other

1  than his retirement. AR 202. She was taking over-the-counter medication until she could not
2  handle it. AR 202.
3      She is now taking prescription medication for blood pressure. AR 202-03. She is not
4  taking any other prescribed medication. AR 203. She takes Aleve or Tylenol for her pain. AR
5  203. At the time of her consultative examination in 2005, she was not taking any medication for
6  high blood pressure. AR 204. She has been on high blood pressure medication since 1998 or
7  1999. AR 204.
8      In response to questions from her attorney, Plaintiff testified that she first went to Kern
9  Medical Center in 2005. AR 204. It took a while to get established as a patient. AR 204. She
10 has been there for treatment about five times. AR 205. One time, they kept her for three days in
11 September or October of 2005. AR 205. In addition to Kern Medical Center, she also started to
12 go to Clinic at Sierra Vista about one year prior to the hearing. AR 205. She has been there
13 three or four times because of the headaches, her heart racing and her left knee swelling up. AR
14 205. They prescribed medication for her pain. AR 205. She took the medication and had it
15 refilled a few times. AR 206. She is not taking it now because she got discouraged. AR 206.
16 She was not feeling good and got overwhelmed with her problems. AR 206.
17     Plaintiff testified that when they reduced her hours from full-time to part-time at the
18 Lawyers Referral Service, it was their choice. AR 206. They reduced her hours because she was
19 missing too much work due to headaches. AR 206. Once they reduced her hours, she was not
20 able to cope better because her headaches were so extreme and she was always getting anxiety
21 attacks. AR 206. It was either leave or be fired. AR 207.
22     After she left, Plaintiff filed for unemployment. AR 207. It was approved. AR 207.
23 During that time, she looked for work. AR 207. She got a job as a salesclerk at Gottschalks.
24 AR 207. She only worked a day and a half because her feet were swelling up, her knee was
25 hurting and swelling up and her heart was racing all the time. AR 207. She could not continue.
26 AR 207.
27     During the time she was experiencing stress at work, the doctor never referred her to a
28 psychiatrist. AR 208. She thought if the doctor did not refer her, "he figured medication would

4

help it." AR 208. Dr. Gannon, the neurologist, told her that her anxiety attacks or panic attacks were somewhat mental. AR 208. She had a brain MRI at Kern Medical Center and in Stockton. AR 208-09. The brain MRI came out okay. AR 209. They thought she might have had a stroke because she had a few episodes where her left eye would turn in and she had double vision. AR 209. She has had about two or three episodes of her eye turning in since she has been in Bakersfield. AR 209. She does not have double vision now. AR 209.

Plaintiff testified that she does not feel she could return to any part of the job at the Lawyers Referral Service. AR 210. She would not be able to handle it because of the daily headaches and rapid heartbeat. AR 210. She lives on Excedrin Migraine, which alleviates the headaches a little. AR 211. The prescription medication helped better than the Excedrin. AR 211. She is not on the prescription medication because she got tired of going to the County and sitting there for 10 hours to be seen. AR 211. She owes Kern Medical Center over $10,000 for five visits. AR 212. She does not owe any money to Clinic at Sierra Vista. AR 212.

The VE also testified, reporting that Plaintiff, at age 62, is closely approaching retirement age. AR 212. Her work with the prior employer appeared to be a composite job. AR 212. The descriptions of arbitrating and coordinating cases for fee disputes as a legal secretary is classified as sedentary skilled, SVP level six, with frequent reaching, handling, and fingering, and a complexity level dealing with a variety of concrete variables in situations where limited standardization exists, and interpreting a variety of instructions. AR 213. Another aspect of the job is accounts payable/receivable, which is sedentary skilled, SVP level five, with frequent reaching, handling, and fingering, with level four complexity. AR 213. She also worked as an information and referral clerk, which is classified as sedentary, SVP level three, and complexity level, reasoning level three, with understanding and carrying out instructions furnished in written, oral or verbal form and dealing with problems involving multiple concrete variable in or from standardized situations. AR 213. The most complex duty that she held was legal secretary. AR 213.

The ALJ asked the VE to assume a person who can lift and carry 50 pounds occasionally, with no standing, walking or postural restrictions, exertional limitations at a medium level, a

dysthymic disorder and a global assessment of 65. AR 213-14. The VE testified that Plaintiff's work as accounts payable and receivable "would be okay from the GAF standpoint," but with even mild difficulty in social functioning, her past work as a referral clerk and legal secretary would not be appropriate. AR 217. Plaintiff would not be able to do all the jobs in the composite, but she would have transferable skills to work as an accounts receivable clerk. AR 217. The VE testified that there would be 697 regional positions and 2.1 million positions in the United States for an accounts payable/receivable clerk. AR 217-18. The VE further testified that if Plaintiff has very severe depression with marked restrictions in concentration and pace, she could not work as an accounts receivable clerk. AR 218.

Medical Record

On June 17, 2003, Plaintiff sought medical treatment for anxiety and other issues. AR 128. Notes from the physical examination included a change from Paxil to Lexapro. AR 128.

On September 18, 2005, Greg Hirokawa, Ph.D., conducted a consultative psychiatric evaluation of Plaintiff. AR 145-150. Plaintiff reported feeling depressed and anxious, with panic attacks, withdrawal, difficulty being around others, poor sleep, mood swings, fatigue and stress. AR 145. On mental status examination, Plaintiff's behavior was cooperative, her stream of mental activity was within normal limits, her thought content appeared appropriate and she denied auditory or visual hallucinations. AR 147. Her mood was depressed and her affect was tearful. AR 147. She was oriented and her intellectual functioning appeared to be within the average range. AR 147. Her recent and past memory appeared intact and her calculation ability was good. AR 147. In connection with her current level of functioning, Plaintiff reported vacuuming, washing dishes, cooking, cleaning, sweeping and laundry. AR 148.

Dr. Hirokawa diagnosed Plaintiff with dysthymia and panic disorder without agoraphobia. AR 148. He assigned her a current Global Assessment of Functioning ("GAF") of 65. AR 148. He opined that her symptom severity of depression was within the mild range and the likelihood of improving within the next 12 months was fair. AR 149. Dr. Hirokawa also opined that Plaintiff's attitude toward seeking employment was poor, but she had a positive work history and maintained a steady job for an extended period of time. AR 149.

Dr. Hirokawa concluded that Plaintiff was capable of managing funds. AR 149. Her ability to understand and remember very short and simple instructions was good, her ability to understand and remember detailed instructions was fair, her ability to maintain attention and concentration was fair, her ability to accept instructions from supervisors and respond appropriately was good, her ability to sustain an ordinary routine without special supervision was good, her ability to complete a normal workday/workweek without interruption at a consistent pace was good, her ability to interact with coworkers was fair, her ability to deal with various changes in the work setting was fair, and the likelihood of her emotionally deteriorating in a work environment was minimal. AR 149.

On October 1, 2005, Sarupinder Bhangoo, M.D., conducted a consultative internal medicine evaluation of Plaintiff. AR 151. Plaintiff complained of neck pain and headaches for five years. AR 151. On physical examination, she moved around well and did not seem to be in any distress. AR 152. Her gait was not antalgic, and she was able to do tiptoe and heel walking. AR 152. Dr. Bhangoo diagnosed Plaintiff with migraine headaches. AR 153. Plaintiff provided a history of daily headaches, lasting 3-4 hours. AR 154. Dr. Bhangoo noted that she otherwise was able to continue her daily life for the last 3-4 years with her personal care, care of the house, driving and other work. AR 154. Dr. Bhangoo commented that Plaintiff took only Aleve or Tylenol for her pain, "suggestive that in spite of such a difficult history, she does not take anything more than that." AR 154. Dr. Bhangoo reported that the examination did not reveal any visual, neurological or musculoskeletal deficits. AR 154.

Dr. Bhangoo opined that Plaintiff could stand and walk eight hours and sit eight hours in an eight-hour workday. AR 154. She could lift and carry 100 pounds occasionally and 50 pounds frequently. AR 154. She did not have any postural or manipulative limitations. AR 154. She also did not have any relevant visual, communicative or workplace environmental limitations. AR 154. Dr. Bhangoo concluded that Plaintiff's maximal functional capacity was heavy due to a lack of objective physical findings. AR 154.

On October 18, 2005, state agency psychiatrist Archimedes Garcia, M.D., completed a Psychiatric Review Technique form. AR 160. Dr. Garcia concluded that Plaintiff's impairments in the categories of affective disorders and anxiety-related disorders were not severe. AR 160.

Plaintiff was admitted to Kern Medical Center on September 22, 2006. AR 161-63. She was diagnosed with stable angina and a presyncopal episode. She was discharged on September 28, 2006. AR 161.

On January 4, 2007, Plaintiff sought treatment at Clinica Sierra Vista for complaints of double vision with headache and pain on the back of her eye. AR 170. Plaintiff reported double vision for 2-3 weeks. AR 170. She was referred to the emergency room. AR 170. Plaintiff received emergency treatment at Kern Medical Center. AR 164. She underwent a CT scan of her brain/head, which revealed cortical atrophy, but otherwise unremarkable findings. AR 164, 181.

On January 18, 2007, Plaintiff sought treatment at Kern Medical Center. AR 176. She was diagnosed with a migraine headache. AR 176-78

On March 2, 2007, Plaintiff sought treatment at Clinica Sierra Vista for follow-up. Plaintiff complained of pain in her left knee, a weak bladder and a reported episode of chest pain in September 2006. AR 169. On examination, Plaintiff had mild crepitus of her left knee. AR 169. An x-ray revealed no obvious deformity, but showed arthritic changes. AR 169, 173. The nurse practitioner assessed Plaintiff with left knee pain, hypertension, and stress incontinence. AR 169. She was prescribed Ibuprofen. AR 169.

On April 14, 2007, Plaintiff sought treatment at Clinica Sierra Vista for follow-up treatment. AR 168. She reported episodes of rapid heartbeat. AR 168. The nurse practitioner assessed her with hypertension and bronchitis. AR 168.

On May 7, 2007, Plaintiff sought treatment at Clinica Sierra Vista for complaints of a swollen face for one week. AR 167. She was assessed with rosacea. AR 167.

ALJ's Findings

The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2007. AR 15. She had not engaged in substantial gainful

1   activity since her alleged onset date. AR 15. She had the severe impairment of headaches. AR
2   15. Despite this impairment, the ALJ found that Plaintiff retained the residual functional
3   capacity to perform the full range of medium work. AR 17. Given this RFC, the ALJ concluded
4   that Plaintiff could not perform her past relevant work. AR 20. However, she had acquired work
5   skills from past relevant work that were transferable to other occupations with jobs existing in
6   significant numbers in the national economy. AR 21.

## SCOPE OF REVIEW

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act. In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. 405 (g). Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance. *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401. The record as a whole must be considered, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995 (9th Cir. 1985). In weighing the evidence and making findings, the Commissioner must apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988). This Court must uphold the Commissioner's determination that the claimant is not disabled if the Commissioner applied the proper legal standards, and if the Commissioner's findings are supported by substantial evidence. See *Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

## REVIEW

In order to qualify for benefits, a claimant must establish that she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that she has a physical or mental impairment of such severity that she is not only unable to do her previous work, but cannot, considering her age,

9

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(g), 416.920 (a)-(g). Applying the process in this case, the ALJ found that Plaintiff: (1) has not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" (headaches) based on the requirements in the Regulations (20 C.F.R. §§ 404.1520, 416.920); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, 20 C.F.R. Part 404; (4) cannot perform her past relevant work; but (5) has acquired work skills that are transferable to other occupations with jobs existing in significant numbers in the national economy. AR 15-21.

Here, Plaintiff argues that the ALJ committed reversible error by (1) failing to address the transferability of her work skills to other sedentary work under Grid Rule 210.00(f); and (2) improperly evaluating her credibility.

## DISCUSSION

A.    Transferability of Skills

Plaintiff asserts that the ALJ found Plaintiff retained the residual functional capacity to perform other work consisting of sedentary skilled work. Opening Brief, p. 7. Based on this RFC, Plaintiff contends that the ALJ failed to make the requisite finding, mandated by 20 C.F.R., Part 404, section 201.00(f), that a person of advanced age or closely approaching retirement age possesses transferable skills to sedentary skilled work activity.

Section 210.00(f) provides that in order to find transferability of skills to skilled sedentary work for individuals who are of advanced age (55 or over), "there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings or the industry." 20 C.F.R., Part 404, § 201.00(f). Agency regulations consider "advanced age" (age fifty-five or

1  older) as "the point where age significantly affects a person's ability to do substantial gainful
2  activity." *Terry*, 903 F.2d at 1275 (citing 20 C.F.R. § 404.1563(d)).  "The ALJ must either make
3  a finding of 'very little vocational adjustment' or otherwise acknowledge that a more stringent
4  test is being applied which takes into consideration [claimant's] age." *Renner v. Heckler*, 786
5  F.2d 1421, 1424 (9th Cir.1986) (per curiam) (quoting 20 C.F.R. Pt. 404, Subpt. P, 201.00(f)).
6        In this case, the VE testified that Plaintiff could perform work as an accounts receivable
7  clerk, which is sedentary skilled work.  AR 213, 217.  The ALJ did not make an express
8  statement regarding "very little vocational adjustment."  However, the ALJ considered whether
9  Plaintiff had transferable skills from her past relevant work.  In his decision, the ALJ reported
10 that the VE "was asked if any occupations exist which could be performed by an individual with
11 the same age, education, past relevant work experience, and residual functional capacity as the
12 claimant, and which require skills acquired in the claimant's past relevant work but no additional
13 skills."  AR 21.  The VE expressly testified that Plaintiff would have transferable skills from her
14 composite job (which included work as an accounts receivable clerk) to work as an accounts
15 receivable clerk.  AR 21, 213, 217.  Based on this testimony, the ALJ concluded that Plaintiff
16 had acquired work skills from her past relevant work that are transferable to other occupations.
17 AR 21.  That the ALJ did not make an express statement of "very little vocational adjustment" is
18 of little significance given that Plaintiff previously worked as an accounts receivable clerk in her
19 composite job, with directly transferable skills.
20       The Commissioner contends that the ALJ found Plaintiff capable of performing other
21 medium work in the economy.  Responsive Brief, p. 3; AR 21.  Such a finding, the
22 Commissioner argues, generally does not raise the issue of transferability of skills.  The
23 Commissioner explains that with regard to individuals closely approaching retirement age, the
24 significant vocational issues are whether they have a "history of unskilled work and ... marginal
25 education or less."  20 C.F.R., Pt. 404, Subpt. P, § 203.00(c).  For individuals closely
26 approaching retirement age, the Medical-Vocational Guidelines ("the grids") direct a finding of
27 "disabled" at the medium exertional levels for individuals with unskilled or no prior work
28 experience and a limited education (not a high school graduate).  Grid Rule 203.01, 203.02.  The

Commissioner correctly asserts that Plaintiff does not meet these conditions because she is a high school graduate with a skilled work history. AR 189-90, 213.

As noted by the Commissioner, the ALJ incorrectly applied Grid Rule 203.16 (age 55 or over) to Plaintiff, who was in the next age category (60 or older). AR 20. The Commissioner contends that although Plaintiff did not raise this issue in her opening brief, the ALJ's mistake is harmless error because Plaintiff does not meet the conditions for a disability in the correct age category. Responsive Brief, p. 4; Grid Rules 203.01, 203.02. As the Commissioner indicates, the grids direct a finding of not disabled when the correct age category is applied. Therefore, any error on the part of the ALJ is harmless because it is inconsequential to the ultimate disability determination. *Stout v. Commissioner, Social Sec. Admin.*, 454 F.3d 1050, 1055-56 (9th Cir. 2006) (discussing principle that an error is harmless where it is inconsequential to ALJ's determination); *see also Curry v. Sullivan*, 925 F.2d 1127 (9th Cir. 2006) (ALJ's erroneous vocational findings based on incorrect age found inconsequential).

In reply, Plaintiff argues that the ALJ made allowances for the mental requirements of work activity, i.e., a non-exertional impairment, rendering the grids inapplicable and requiring vocational expert testimony. While significant non-exertional impairments may make reliance on the grids inappropriate, the mere allegation of a non-exertional limitation does not automatically preclude the application of the grids. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d 573, 577 (9th Cir. 1988). If the ALJ finds that a non-exertional limitation exists, and that it significantly affects the range of work described in the grids, use of the grids would be inappropriate and a vocational expert would be needed to describe what, if any, jobs existed in the national economy that plaintiff would be able to perform. *Id.*

Here, the ALJ did not determine that Plaintiff had non-exertional mental limitations that significantly affected the range of work described in the grids. Indeed, the ALJ found that Plaintiff's dysthymia did not cause more than minimal limitations in Plaintiff's ability to perform basic mental work activities. AR 16. However, the ALJ solicited the VE's testimony about a hypothetical claimant with non-exertional mental limitations, including a dysthymic disorder and a global assessment of 65. AR 213-14. In response to the hypothetical, the VE testified that such

a person is capable of performing the accounts payable and receivable portion of Plaintiff's past relevant work. AR 216-17. The ALJ relied on the VE's testimony in reaching his determination that Plaintiff could perform other work in the national economy. AR 21.

Plaintiff essentially contends that because the VE testified that Plaintiff could perform work as an accounts receivable clerk, which is in the sedentary skilled category, the ALJ was required to make the transferability finding mandated by section 201.00(f). Even crediting Plaintiff's argument, however, the ALJ made an appropriate transferability finding. AR 19.

B.     Credibility

Plaintiff contends that the ALJ failed to state legally sufficient reasons for rejecting her complaints. An ALJ must engage in a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007). The ALJ first must determine whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir.1991) (en banc) (internal quotation marks omitted). If the claimant meets this first test, and there is no evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of her symptoms only by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); *see also Robbins v. Social Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) ("[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each.").

Here, the ALJ found that Plaintiff met the requirement at the first step, stating that her "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 18. However, the ALJ further found that Plaintiff's statements concerning the intensity, persistence and limiting effects were not entirely credible. AR 18. Plaintiff takes issue with the reasons cited by the ALJ for finding Plaintiff's testimony not entirely credible. Opening Brief, p. 13.

Plaintiff first faults the ALJ for noting Plaintiff's poor attitude toward employment as reported by Dr. Hirokawa. AR 18, 149. Plaintiff argues that the ALJ failed to consider that, as a consequence of her life circumstances, she "gave up." Opening Brief, p. 11. However, the ALJ may use "ordinary techniques" in addressing credibility, *Tommasetti v. Astrue*, 533 F.3d 1034, 1039 (9th Cir. 2008), and may make inferences "logically flowing from the evidence." *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

Plaintiff next faults the ALJ for noting a normal physical examination by Dr. Hirokawa, arguing that "[n]o one expected an abnormal physical examination for migraine headaches" and Dr. Hirokawa did not have the opportunity to review later records showing the presence of crepitus or grinding in the left knee. Opening Brief, p. 11. Plaintiff incorrectly contends that the ALJ relied on Dr. Hirokawa's physical examination. Dr. Hirokawa conducted a consultative psychiatric examination, while Dr. Bhangoo conducted the consultative internal medicine evaluation referenced by the ALJ. AR 18-19, 145-50, 151-54. On physical examination, Dr. Bhangoo reported that Plaintiff moved around well, her gait was not antalgic and she was able to do tiptoe and heel walking. AR 152-53. The examination did not reveal any musculoskeletal deficits and Plaintiff reported taking only Aleve or Tylenol for her pain. AR 154. An ALJ may properly consider testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains. *Thomas v. Barnhart,* 278 F.3d 947, 959 (9th Cir. 2002) (citing *Light,* 119 F.3d at 792 (9th Cir. 1997)). Plaintiff does not cite evidence to contradict Dr. Bhangoo's conclusion that Plaintiff's maximal functional capacity was heavy due to a lack of objective physical findings. AR 154. Although Plaintiff cites later medical reports and findings regarding her knee, these records demonstrate that Plaintiff had only "mild crepitus" in her left knee and "arthritic changes." AR 169, 173. No physician opined that she was limited in her ability to work or that her functional capacity was diminished as a result of these findings.

Plaintiff also faults the ALJ for considering her failure to receive "more aggressive, more supervised, or more prescription intensive treatment." AR 19. Plaintiff argues that the ALJ erred by not considering her lack of funds and debt to the county, asserting that the ALJ cannot discount her testimony because she could not afford treatment. Plaintiff is correct that an ALJ

14

cannot deny benefits because a claimant cannot obtain treatment due to a lack of funds. *Orn v. Astrue,* 495 F.3d 625, 638 (9th Cir. 2007) (citing *Gamble v. Chater*, 68 F.3d 319, 321 (9th Cir.1995). In this case, however, the ALJ did not discredit Plaintiff's testimony based on a failure to obtain treatment. Instead, the ALJ acknowledged that Plaintiff had started treatment at a clinic one year prior to the hearing, she received only "conservative routine maintenance," her headaches and visual problems were "episodic," and she had regular medical treatment. AR 18-19. According to the record, Plaintiff did not have any outstanding debt with the clinic, but she did not consistently seek treatment for headaches, visual problems or other alleged impairments from the clinic. AR 167 (rosacea), 168 (rapid heartbeat), 169 (knee pain/bladder), 170 (headache/double vision), 212.

The ALJ also commented that Plaintiff was not taking any medications and there were no significant increases or changes in her prescribed medications. AR 19. The Court notes that Plaintiff testified to taking blood pressure medications, but only Excedrin Migraine for her headaches. AR 202-04, 210-11. Evidence of "conservative treatment," such as a claimant's use of only over-the-counter pain medication, is sufficient to discount a claimant's testimony regarding severity of an impairment. *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007). Contrary to Plaintiff's assertions, she reportedly stopped taking the medication not because of financial issues, but because she got discouraged and she got tired of "going to the county and setting there for 10 hours to be seen." AR 200, 211. Moreover, the ALJ noted other factors going toward the credibility determination including: Plaintiff's medical records did not support her claims that her impairments were totally debilitating and Plaintiff's treating and examining sources did not determine that Plaintiff's impairments were totally debilitating or rendered her completely unemployable. AR 19.

Plaintiff also faults the ALJ for considering her ability to carry on with the minimal demands of daily living. AR 19. Plaintiff argues that the ALJ did not account for (1) the capacities found to be "fair" by Dr. Hirokawa; (2) her inability to tolerate a full-time schedule, or (3) the testimony that "while functional a significant portion of the time is debilitated enough that she lost her job." Opening Brief, p. 13. An ALJ is entitled to examine Plaintiff's daily activities.

*Thomas*, 278 F.3d at 958. In this instance, the ALJ considered Plaintiff's testimony and reports to examining physicians describing her daily activities. AR 19. The ALJ found that these activities were not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. AR 19. For example, Plaintiff reported to Dr. Hirokawa in September 2005 that she vacuums, washes dishes, cooks, cleans, sweeps, does laundry, reads the newspaper and watches television. AR 16, 148. Similarly, Plaintiff reported to Dr. Bhangoo that she is able to manage her personal care, take care of her household, drive a car, go grocery shopping, visit family and visit her son four hours away in Stockton. AR 16, 151. Dr. Bhangoo indicated that despite her reported headaches, Plaintiff was able to continue her daily life for the last 3-4 years with her personal care, care of the house, driving and other work. AR 154. Additionally, Plaintiff's adult function report demonstrates that she is able to prepare meals, read the newspaper, watch television, take care of her personal care, wash dishes, do laundry, pick up after herself, drive a car, go grocery shopping, pay bills, count change, handle a savings account, and use a checkbook/money order.[3] AR 16, 85-92. The ALJ concluded that Plaintiff had the ability to care for herself and to maintain her home, which was not inconsistent with the performance of many basic work activities. AR 19; *Morgan v. Commissioner of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999) (If a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of physical functions that are transferable to a work setting, a specific finding as to this fact may be sufficient to discredit a claimant's allegations); *Curry*, 925 F.2d at 1130 (ability to take care of personal needs, prepare easy meals, do light housework, and shop for some groceries may be seen as inconsistent with the presence of a condition which would preclude all work activity).

Plaintiff further contends that the ALJ wrongly stated that the record fails to document a claimed hospitalization. AR 19. The record reflects that Plaintiff was sent to the emergency room on one occasion for her headaches, but there are no other reported hospitalizations for her impairment. AR 170, 177. As such, this error by the ALJ does not invalidate the credibility

---

[3]The ALJ incorrectly noted that Plaintiff takes daily walks. AR 16. In the adult function report, Plaintiff indicated that she used to take daily walks, but now she cannot. AR 89.

determination. *Batson v. Barnhart*, 359 F.3D 1190, 1197 (9th Cir. 2004) (upholding ALJ's credibility determination even though one reason may have been in error).

The Court finds that the ALJ's credibility determination was proper. The ALJ used ordinary techniques of credibility evaluation and gave specific, clear and convincing reasons supported by substantial evidence. See *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial evidence in the record as a whole and is based on proper legal standards. Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The clerk of this Court is DIRECTED to enter judgment in favor of Defendant Michael J. Astrue, Commissioner of Social Security, and against Plaintiff Denise Atilano.

IT IS SO ORDERED.

Dated:   **June 10, 2009**                              **/s/ Dennis L. Beck**
                                                        UNITED STATES MAGISTRATE JUDGE